The dispositive issue raised by plaintiff's appeal is whether the trial court erred in directing a verdict in favor of defendant.
Plaintiff, Matilda Rakowski, was twenty-five years of age at the time of her employment by defendant corporation to fluoroscope rubber beltings to determine if there were any defects therein. The X-ray department, where she was employed, consisted of two rooms, one wherein the fluoroscopic X-ray machine was located and an adjacent room where she operated it. The rubber belts were placed on pulleys in the room where the fluoroscopic machine was located, outside of which room there was a control box from which the plaintiff operated the machine. She operated the machine only in the outside room. By looking through a leaded glass window located in the wall of the lead lined room and above the control box, plaintiff viewed the fluoroscopic machine while it was in operation. When she had completed the viewing she would stop the machine, go inside with a helper to take the belt off, change its position and inspect it again from the outside room in the same manner. The machine was operated at a kilo-voltage of from 85 to 110 and at a milliamperage of 4 to 5. Plaintiff satisfactorily passed a physical examination at the defendant's plant hospital at the time of her employment. Prior to that time she had enjoyed good health. Plaintiff contends that the proofs establish a prima facie case that the impairment of her health, described as premature menopause and telangiectasis in the central portion of her face, showing fine superficial capillaries, indicating that the skin had been damaged and was prematurely aging, was attributable to the X-rays to which she was exposed and that the negligence of the defendant was the proximate cause of her injuries.
Plaintiff offered in evidence the "American War Standard Safety Code for the Industrial Use of X-rays" approved May 31, 1945, and a revised safety code for the industrial use of *Page 206 
X-rays approved April 15, 1946, originated by a group of recognized scientists through the American Standard Association. These codes establish the roentgen as the international unit of quantity used as the symbol for the measurement of X-rays and gamma rays, and milliroentgen is a subunit of the roentgen and is equal to 1/1000 of the roentgen. The codes classified different types of installations, viz.: Class A, Class A-1, Class B, Class B-1 and all other installations, which do not conform to these four, known as Class C. The proofs reasonably establish that defendant's equipment in the construction and operation of its fluoroscopic apparatus qualified as Class A, totally protective installation. One of the requirements of the code necessary to qualify for Class A installation provides:
"(b) The dosage rate in milliroentgens per hour at any accessible point outside of the protective enclosure is not greater than 12.5 mr per hr (0.0125 r per hr) when the radiation beam is adjusted to give the maximum dosage rate at the point in question, with the X-ray generator running at its rated capacity;"
The exposure of a person for an eight hour day, six day week, to 12.5 milliroentgens per hour, under the circumstances here, is the permissible daily dose.
Appellant argues that she established a prima facie case of negligence against the defendant as the proximate cause of her injuries; that, in the light of the proofs, the questions as to whether defendant's installation was in conformity with the standard practice in comparable industry, whether there was any negligence chargeable to defendant in the operation of the machine, and whether such negligence was the proximate cause of plaintiff's injuries, raised factual issues which should have been submitted to the jury for its determination; and contends, therefore, the court erred in directing a verdict against plaintiff. It is academic to state that the trial court cannot weigh the evidence, but must accept as true all testimony that supports the view of the party against whom the motions are made.Skiba v. Hmieleski, 106 N.J.L. 597 (E. A. 1929). Where fair minded men might *Page 207 
honestly differ as to the conclusions to be drawn from the facts, the question at issue should go to the jury. Lipschitz v. N Yand N.J. Produce Corp., 111 N.J.L. 392 (E. A. 1933).
It is the general rule that the mere fact that an instrumentality may become dangerous to others does not constitute its possessor an insurer against injury that may result therefrom. Liability for negligence in respect to dangerous instrumentalities, as liability for negligence generally, arises from the failure to use due care. A higher degree of care is required in dealing with a dangerous agency than in the ordinary affairs of life or business which involve little or no risk. The law exacts of one who puts a force in motion that he shall control it with a skill and care in proportion to the danger created and with appliances which, in view of the circumstances, are reasonably safe. In other words, the essential requirement of due care under the circumstances necessarily implies that the care required to prevent injury to others in using a dangerous instrumentality is a great or high degree and every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken. Beck v.Monmouth Lumber Co., 137 N.J.L. 268 (E. A. 1947).
"It is a corollary of the maxim `sic utere tuo ut alienum nonlaedas' that everyone shall investigate, inspect, and test the instrumentalities maintained by him, for the purpose of determining the possibility of perils therein. Every peril, it is safe to say, including such as are termed `latent' or `hidden,' need not be discovered, since liability for negligence in keeping a dangerous instrumentality is not absolute. If, however, common experience has demonstrated that dangers lurk in the method adopted or in the instrumentality maintained by a person, he rests under the obligation of ascertaining the peril and taking precautions to avoid injury therefrom." 38 Am. Jur., § 87, p.
747.
In the case of Beck v. Monmouth Lumber Co., supra, Mr. Justice Wachenfeld, speaking for the Court of Errors and Appeals, emphasized the generally accepted principle, when he stated: *Page 208 
"* * * the responsibility defined and actually imposed is the use of reasonable care consistent with the dangerous instrumentality employed and a proper anticipation of the results which could be reasonably foreseen."
and Mr. Justice Wachenfeld, in the same opinion, further stated:
"`The principles of law applicable to these issues are well settled. Whoever uses, controls or manages a highly destructive agency (electric current) is held to a correspondingly high degree of care. Anderson v. Jersey City Electric Light Co.,63 N.J.L. 387, 390, 43 A. 654; Heyer v. Jersey Central Power,c., Co., 106 N.J.L. 211, 214, 147 A. 452. And while the degree of care which is required is that which is exercised by persons of ordinary prudence under same or like circumstances, and while the adoption and operation of a method which accords with that in general use by well-regulated companies and approved by experience is a due performance of duty and care owed (Heyerv. Jersey Central Power, c., Co., supra (at p. 213), and cases cited), the care to be exercised, the duty to be fulfilled, means more than the mere employment and use of approved mechanical appliances. Rather does it mean the exercise of that degree of care, of that manner of fulfillment of duty, which comprehends a circumspection, a foresight, a prevision which has due and proper regard to reasonably probable contingencies.'"
In dealing with the question of the propriety of the granting of defendant's motion for a directed verdict, we have carefully examined all of the testimony before the court and are persuaded that the proofs reasonably establish that defendant's equipment and installation, as well as its operation, conformed to the recognized standard in general use in that field of industrial activity, approved by experience, and that defendant exercised a "high degree of circumspection, a foresight, a prevision which has due and proper regard to reasonably probable contingencies" that might reasonably ensue from the construction, installation and operation of the fluoroscopic machine.
In deciding this issue, there are two questions to be determined, viz.: (1) Was the defendant guilty of failing to furnish instrumentalities in connection with the operation of the fluoroscopic X-ray machine in conformity with the standard practice in general use by well regulated companies, approved *Page 209 
by experience, and did defendant fail to exercise a high degree of circumspection and foresight with regard to any reasonably probable contingencies; and (2) did the defendant negligently expose plaintiff to a quantity of harmful X-rays and was that negligence the proximate cause of plaintiff's injuries?
 I.
Plaintiff introduced in evidence the code and revised code adopted by the American Standards Association as establishing the standard of construction and operation of X-ray fluoroscopic machines in business comparable with defendant's. The testimony reveals that defendant's construction and installation fully complied with such standard; that defendant engaged a competent and recognized expert of many years experience in the field of X-rays, radium and radiations emitted by radioactive materials to advise and counsel defendant as to the construction of the two rooms for the installation of the fluoroscopic X-ray machine and its operation and tests were made by him both prior to and subsequent to its operation; that the construction, installation and operation were in accord with this expert's recommendations; that all necessary precautions were thus taken for the reasonable safety and protection of the operator of the machine; that the quantity of X-rays that penetrated the room where the plaintiff operated the machine were considerably less than the permissible dosage of X-rays that might be safely absorbed by the human body under the conditions prevailing at the place of employment. On the contrary, the plaintiff, as was its duty, did not establish aprima facie case of actionable negligence against the defendant by proving that its installation of the X-ray fluoroscopic machine and construction of the two rooms for its operation did not conform to the standard of such installation as established by the codes heretofore mentioned and recognized as standard practice or that its subsequent operation was not in conformity with such standard of usage or that it failed to exercise "that degree of care, of that manner of fulfillment of duty, which comprehends a circumspection, *Page 210 
a foresight, a prevision which has due and proper regard to reasonably probable contingencies." Plaintiff's proofs, proffered through the testimony of experts, considering them in the most favorable light to which they were entitled, sought to establish that the defendant's installation was not in conformity with a standard of their own and which they asserted should have been established by defendant, rather than testifying that defendant's installation and its operation were not in conformity with the standard practice in the industry. This is contrary to the recognized rule and, if followed, would mean that industrial concerns would be subjected to the mere caprice of juries, and held accountable for actionable negligence regardless of whether they adopted a recognized standard of installation or not.Seckler v. Pennsylvania R.R. Co., 113 N.J.L. 299 (E. A.
1934); Feil v. West Jersey Seashore R.R. Co., 77 N.J.L. 502
(E. A. 1908).
 II.
The testimony is uncontroverted that an exposure to 12.5 milliroentgens per hour for an eight hour day, six day week, would be harmless, so recognized by the code and the standard for the industry. The test made of the fluoroscopic X-ray machine while in operation under the conditions prevailing both prior to, during and subsequent to its use by the plaintiff, indicated that at no time was the maximum amount of radiation in the room where plaintiff worked more than one-half of the permissible recognized dosage. When a test was made to determine the amount of radiation that might enter the room where plaintiff worked, even if the doors of the X-ray room were left open, it disclosed that at the operator's position the radiation was considerably less than the permissible dose of 12.5 milliroentgens per hour. Plaintiff did not proffer any testimony which controverted the evidence that the standard practice as to maximum amount of permissible dosage is 12.5 milliroentgens per hour. Neither did plaintiff produce proof of measurements of X-rays that penetrated *Page 211 
the room where plaintiff operated the machine which in any way controverted defendant's measurements thereof. Plaintiff's medical and expert witnesses testified, in substance, that her impaired physical condition was attributable to the absorption of the X-rays that penetrated into the room where she worked. However, a careful review of their testimony convinces us that plaintiff failed to make out a prima facie case that the defendant's installation and operation of the fluoroscopic machine did not conform to the standard set up by the codes offered in evidence by plaintiff and to the standard practice for such business. It follows that there was no inference of negligence chargeable to the defendant for plaintiff's injuries that could be drawn from the proofs; consequently, no factual issue of actionable negligence against the defendant was raised for the jury's determination.
Under this posture of the case, at the time of defendant's motion for a directed verdict, the plaintiff had utterly failed to establish a prima facie case of actionable negligence against the defendant in connection with the use and operation of the fluoroscopic X-ray machine; and, accordingly, there was no factual issue that the court could properly submit to the jury.
We have examined plaintiff's other grounds of appeal and find there was no error prejudicial to plaintiff's case.
The judgment is affirmed. *Page 212